**United States District Court**
For the Northern District of California

1
2
3
4
5                              UNITED STATES DISTRICT COURT

6                            NORTHERN DISTRICT OF CALIFORNIA

7

8   TRUONG GIANG CORP.,                          No. C-06-3594 JSW (EMC)

9              Plaintiff,

10         v.                                    **REPORT AND RECOMMENDATION
                                                 RE PLAINTIFF'S MOTION FOR**
11  TWINSTAR TEA CORP. and MING LEE              **DEFAULT JUDGMENT**
    TRADING, INC.,
12
           Defendants.                           **(Docket No. 11)**
13  _____/

14

15         Plaintiff Truong Giang Corporation ("TG") has moved for default judgment against

16  Defendant Twinstar Tea Corporation ("Twinstar").  Judge White referred the matter to the

17  undersigned for a report and recommendation.  Having considered TG's brief and supporting

18  documents, and all other evidence of record, the Court hereby recommends that the motion for

19  default judgment be **GRANTED**.  The Court further recommends the issuance of an injunction, an

20  accounting, and retention of jurisdiction to assess damages after accounting.

21              **I.     FACTUAL AND PROCEDURAL BACKGROUND**

22         On June 6, 2006, TG filed a complaint against Defendants Twinstar and Ming Lee Trading,

23  Inc. ("Ming Lee"),[1] asserting five causes of action: (1) infringement of federal trademark registration

24  No. 2,570,889; (2) infringement of federal trademark registration No. 2,561,662; (3) false

25  designation of origin in violation of 15 U.S.C. § 1125(A); (4) common law unfair competition and

26  trademark infringement; and (5) statutory unfair competition in violation of California Business and

27  _____

28         [1] Though TG asserted claims against both Twinstar and Ming Lee in its original complaint, *see*
    Compl. ¶ 3, TG has moved for default judgment against Twinstar only.  *See* Mot. at 1.

United States District Court

For the Northern District of California

1  Professions Code § 17200 *et seq.* The allegations underlying the above claims are as follows, as

2  further detailed in TG's complaint and motion for default judgment.

3      TG sells its 3 BALLERINA tea in Asian grocery stores across the country. *See* Compl. ¶ 8;

4  *see also* Mot. at 2. TG has registered two trademarks in conjunction with this product: (1) the word

5  mark 3 BALLERINA and (2) a design mark consisting of a drawing of three slender ballerinas. *See*

6  Compl. ¶¶ 4, 7, 14. TG has used the 3 BALLERINA word mark nationwide on its tea products,

7  advertising, and promotional materials since as early as August 2000. *See* Compl. ¶ 8. TG has used

8  its ballerina design mark nationwide since as early as May 1991. *See* Compl. ¶ 15. Both the word

9  mark and the design mark were registered for ten-year terms beginning on May 21, 2002, and April

10  16, 2002, respectively. *See* Compl. Exs. A, E (certifications of TG's registration of the 3

11  BALLERINA word mark and ballerina design mark).

12      Twinstar, incorporated in New York in 2002, has been selling the tea product SLIM

13  BALLERINA since at least 2003. *See* Hansen Decl., Ex. 9 (letter from TG to U.S. Customs and

14  Border Protection, dated 5/12/05, stating that, "[t]o the best of our knowledge and belief, Twinstar

15  commenced sale of the 'Ballerina' tea product less than two (2) years ago"); *see also* Ly Decl. ¶ 3

16  (stating that "[m]y distributor told me he had seen SLIM BALLERINA tea for sale since at least

17  2003"). The SLIM BALLERINA tea features on its product packaging a design consisting of a

18  drawing of two ballet dancers. *See* Compl. ¶¶ 9, 16; *see also* Ly Decl. ¶ 3. Twinstar sold the SLIM

19  BALLERINA tea nationwide through the channels of distribution including Asian supermarkets and

20  the internet. *See* Ly Decl.¶¶ 3-4; *see also* Hansen Decl., Exs. 14, 15. Twinstar's SLIM

21  BALLERINA tea was sold in San Francisco as recently as March 2006 by Ming Lee, *see* Compl. ¶

22  9, and, as of October 20, 2006, Twinstar's SLIM BALLERINA tea was still on sale on the Internet.

23  *See* Hansen Decl. ¶ 17 (referring to Ex. 15, a printout list of items sold by Ecomeal.org).

24      On December 17, 2004, TG sent an initial cease-and-desist letter to Twinstar, notifying

25  Twinstar that its SLIM BALLERINA tea was in violation of TG's 3 BALLERINA word mark. No

26  mention was made of the ballerina design mark. *See* Hansen Decl., Ex. 6. On January 8, 2005, in

27  response to TG's letter, Twinstar affirmed that it would no longer produce and distribute tea bearing

28  the SLIM BALLERINA word mark, but it noted that a small quantity of products remained in the

United States District Court

For the Northern District of California

marketplace. *See* Hansen Decl., Ex. 10. Nearly one year later, on December 15, 2005, Twinstar sent a letter to TG informing it that Twinstar had altered its tea product package in order to avoid litigation. *See* Hansen Decl., Ex. 11. To this letter, Twinstar attached copies of its altered tea product package, which bore the product title, "TWINSTAR SLIM TEA," but which featured the same graphical drawing of two ballerinas as the previous package. *See* Hansen Decl., Exs. 11, 5. TG replied soon after, on December 21, 2005, with another cease-and-desist letter, in which it claimed that Twinstar was continuing to infringe not only TG's 3 BALLERINA word mark but also TG's ballerina design mark because SLIM BALLERINA tea was still available for purchase online. TG warned that it was prepared to file suit if necessary. *See* Hansen Decl., Ex. 12. Based on the evidence provided, this letter was the first correspondence to mention infringement of TG's design mark.

In March 2006, TG purchased SLIM BALLERINA tea at Ming Lee, a store located in San Francisco, California. *See* Hansen Decl., Ex. 14. Subsequently, on June 6, 2006, TG filed the instant action against both Twinstar and Ming Lee, and also served the summons and complaint. *See* Docket No. 1 (TG's complaint). It appears that Twinstar received proper and timely formal notice of the original complaint. *See* Docket No. 5 (Summons Returned Executed by TG as to Twinstar, filed September 6, 2006). TG attempted to personally serve Twinstar with the summons and complaint on three occasions at the corporate address on file with the Secretary of State of New York, which is also the home address of Twinstar's president, Kei Sing Ma; however, no one answered the doorbell at the listed address on any of these occasions. *See* Hansen Decl., Ex. 17 (Decl. of Teresa Barnett, legal secretary of TG Corp's counsel). TG also attempted to serve Myron Amer, an attorney who had previously corresponded with TG in this matter on behalf of Twinstar, but Mr. Amer refused service saying that he did not represent Twinstar in the litigation. *See* Hansen Decl., Ex. 17 (Decl. of Teresa Barnett). Ultimately, TG served Twinstar by mail, pursuant to California Civil Procedure section 415.40, and sent the summons and complaint to Twinstar's

1    corporate address.  *See* Docket No. 5 (Return of Service by Mail on Out of State Defendant); *see*

2    *also*, Cal. Code Civ. Proc. § 415.40.[2]  TG received a signed return receipt.  *See* Docket No. 5.

3         Twinstar failed to answer or otherwise respond to the complaint in a timely manner, and so

4    TG informed Twinstar of its intention to request a default judgment, although TG also offered

5    Twinstar one last opportunity to respond to the complaint.  *See* Hansen Decl., Ex. 21.

6    Approximately two weeks later, TG asked the Clerk of the Court to enter Twinstar's default, and

7    default was entered on September 22, 2006.  *See* Docket No. 7.  TG filed its motion for default

8    judgment several months later.  In its motion, TG noted that, as recently as October 20, 2006, it was

9    able to find SLIM BALLERINA tea for sale on the Internet.  *See* Hansen Decl., Ex. 15.

10                                    **II.   DISCUSSION**

11   A.   <u>Legal Standard</u>

12        After entry of a default, a court may grant a default judgment on the merits of the case.  *See*

13   Fed. R. Civ. P. 55.  "The district court's decision whether to enter a default judgment is a

14   discretionary one."  *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).  Factors that a court may

15   consider in exercising that discretion include:

16            (1) the possibility of prejudice to the plaintiff, (2) the merits of
                 plaintiff's substantive claim, (3) the sufficiency of the complaint, (4)
17            the sum of money at stake in the action; (5) the possibility of a dispute
                 concerning material facts; (6) whether the default was due to
18            excusable neglect, and (7) the strong policy underlying the Federal
                 Rules of Civil Procedure favoring decisions on the merits.

19

20   *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).  In considering the above factors, the

21   Court takes all factual allegations in TG's complaint as true, except for those relating to damages.

22   *See TeleVideo Systems, Inc. v. Heidenthal,* 826 F.2d 915, 917-18 (9th Cir. 1987).

23

24   _____

25        [2] California Code of Civil Procedure section 415.40 states,
                 A summons may be served on a person outside this state in any manner provided
26            by this article or by sending a copy of the summons and of the complaint to the
                 person to be served by first-class mail, postage prepaid, requiring a return
27            receipt. Service of a summons by this form of mail is deemed complete on the
                 10th day after such mailing.

28        Cal. Code Civ. Proc. § 415.40 (2007).

                                    4

United States District Court

For the Northern District of California

B.    *Eitel* Factors

    1.    Possibility of Prejudice to Plaintiff

    As discussed below, TG's main claim of trademark infringement is meritorious.  If the Court were to deny TG's motion for default judgment, TG would have no other recourse for recovery.  *See Walters v. Shaw/Guehnemann Corp.*, No. C 03-04058 WHA, 2004 U.S. Dist. LEXIS 11992, at *7 (N.D. Cal. Apr. 15, 2004) ("To deny plaintiffs' motion [for default judgment] would leave them without a remedy.  Prejudice is also likely in light of the merits of their claim.").  Furthermore, in the absence of the injunctive relief granted here, TG would likely continue to suffer harm from the violation of their trademark rights.  *See American Cyanamid Co. v. America Baolishi, Inc.*, No. C 99-0520, 2000 U.S. Dist. LEXIS 10097 (N.D. Cal. July 13, 2000) (in granting default judgment against defendant who violated plaintiff's trademark rights by using a nearly identical trademark on a competing product, court held that without default judgment, plaintiff, a trademark holder "would be prejudiced by customer confusion and mistakes as to the source of the product's ownership, and by suffering further economic detriment").  Accordingly, the first *Eitel* factor, the possibility of prejudice to the plaintiff, weighs in favor of granting default judgment.

    2 & 3.  Merits of Plaintiff's Substantive Claims and Sufficiency of Complaint

    The second and third *Eitel* factors, concerning the merits of plaintiff's substantive claims and the sufficiency of its complaint, also weigh in favor of default judgment.

    As noted above, TG alleges five causes of action in its complaint: (1) infringement of federal trademark registration No. 2,570,889; (2) infringement of federal trademark registration No. 2,561,662; (3) false designation of origin in violation of 15 U.S.C. § 1125(A); (4) common law unfair competition and trademark infringement; and (5) statutory unfair competition in violation of California Business and Professions Code § 17200 *et seq.*  In the present case, as in many trademark infringement cases, the essential elements of the two federal claims -- infringement of federal trademark registration and false designation of origin -- are identical, *see Brookfield Communications, Inc. v. West Coast Entm't Corp.,* 174 F.3d 1036, 1047 n.8 (9th Cir.1999) (noting that infringement and false designation of origin claims are often identical, except that false designation of origin claims protect both registered and unregistered trademarks and can protect a

1    wider range of practices, such as false advertising), and the federal claims, if met with adequate

2    evidence, are also sufficient to establish defendant's liability under the state law claims for unfair

3    competition and trademark infringement. *See Cleary v. News Corp.,* 30 F.3d 1255, 1262-63 (9th

4    Cir. 1994) ("This Circuit has consistently held that state common law claims of unfair competition

5    and actions pursuant to California Business and Professions Code §17200 are 'substantially

6    congruent' to claims made under the Lanham Act."); *Philip Morris v. Shalabi*, 352 F. Supp. 2d

7    1067, 1072 (C.D. Cal. 2004) (noting the identity between the essential elements and standard

8    applied to three distinct claims of federal trademark infringement, federal false designation of origin,

9    and state unfair competition).

10       The Court therefore focuses on the legal merits of only the claims for federal trademark

11   infringement.  Analyzing the merits of the infringement claims is sufficient because the standard of

12   infringement, *i.e.*, the likelihood of confusion, is essentially implicated in the remaining federal and

13   state causes of action. *See M2 Software, Inc. v. Madacy Entertainment Corp.*, 421 F.3d 1073, 1080

14   (9th Cir. 2005) ("The test of trademark infringement under state, federal, and common law is

15   whether there will be a likelihood of confusion."); *see also Academy of Motion Pictures,* 944 F.2d.

16   at 1457 (holding that under both federal trademark infringement and state unfair competition

17   statutes, the "ultimate test" is whether a likelihood of confusion exists) (internal quotations omitted).

18       To prove a claim of trademark infringement under Section 32(1) of the Lanham Act, a

19   plaintiff must show that (1) it owns the trademark at issue; (2) the defendant has used in commerce,

20   without authorization, a copy, reproduction, counterfeit or colorable imitation of the plaintiff's mark

21   in connection with the sale, distribution, or advertising of goods and services; and (3) the

22   defendant's use of the mark is likely to cause confusion or to cause mistake or to deceive. *See* 15

23   U.S.C. § 1114(1).

24       In its complaint, TG alleges all facts necessary to prove trademark infringement by Twinstar.

25   First, TG adequately alleges its ownership of the two trademarks at issue. *See* Compl. ¶¶ 7, 14

26   (referencing Exs. A and E, certifications of TG's registration of the 3 BALLERINA word mark and

27   ballerina design mark); *see also Brookfield Communications*, 174 F.3d at 1047 (holding that a

28   plaintiff's federal registration of a mark constitutes prima facie evidence of its validity and of

**United States District Court**
For the Northern District of California

1  plaintiff's exclusive rights to the mark).  Second, the "use in commerce" requirement is satisfied as

2  to Twinstar.  TG states in its complaint that Twinstar has used the name SLIM BALLERINA alone

3  and in conjunction with drawings of ballet dancers on its tea packaging, advertising, and

4  promotional materials throughout the United States, *see* Compl. ¶¶ 8, 9, 15, 16, and without TG's

5  consent.  *See* Compl. ¶¶ 10, 17.

6        The third and "core" element of trademark infringement is the likelihood of confusion, or

7  whether the similarity of the marks is likely to confuse customers about the source of the products.

8  *See E&J Gallo Winery v. Gallo Cattle*, 967 F.2d 1280, 1290 (9th Cir. 1992).  Likelihood of

9  confusion is analyzed using an eight-factor test established by the Ninth Circuit.  *See id.* (citing *AMF

10  Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979) (finding a likelihood of confusion

11  existed between plaintiff's SLEEKCRAFT mark and defendant's SLICKCRAFT where the marks

12  were product names of recreational boats produced by the two parties)).  Applying this test to both

13  the SLIM BALLERINA word mark and ballerina design mark, the Court concludes that TG has

14  successfully pled a likelihood of confusion, whether the word and design marks are used separately

15  or together.  Of the eight factors, the Court finds that five weigh in favor of finding a likelihood of

16  confusion of both the SLIM BALLERINA word mark and ballerina design mark: (I) strength of the

17  allegedly infringed mark; (ii) proximity or relatedness of the goods; (iii) similarity of the sight,

18  sound, and meaning of the marks, (iv) degree to which the parties' marketing channels converge;

19  and (v) the type of goods and degree of care consumers are likely to exercise in purchasing them.

20        a.    Word Mark

21             i.    Strength of Allegedly Infringed Mark

22        The strength of TG's word mark is adequately alleged in its pleadings and weighs in favor of

23  a likelihood of confusion.  The strength of a mark is based on the distinctiveness of the mark and

24  whether it has acquired secondary meaning, *i.e.*, whether it has come to be associated with a good or

25  service.  *See Gallo Cattle*, 967 F.2d. at 1291.  The distinctiveness of a mark depends on its

26  placement on a "continuum of marks from 'generic,' afforded no protection; through 'descriptive,' or

27  'suggestive,' given moderate protection; to 'arbitrary' or 'fanciful' awarded maximum protection."

28  *Nutri/System, Inc. v. Con-Stan Industries, Inc.*, 809 F.2d 601, 605 (9th Cir. 1987).  TG's 3

**United States District Court**
For the Northern District of California

BALLERINA word mark is suggestive, as applied to TG's "herbal dietary supplement" tea, *see*

Hansen Decl., Ex. 1 (colored copy of TG's 3 BALLERINA tea package, containing labels "Herbal

Dietary Supplement" and "DIETER'S TEA").  Suggestive marks are those which convey an

impression of a good but require the exercise of imagination and perception to reach a conclusion as

to the product's nature.  *See Brookfield Communications,* 174 F.3d at 1058, n.19 (providing as an

example of a suggestive mark, "Roach Motel" for insect traps) (internal citations omitted); *see also*

*Thane Int'l, Inc. v. Trek Bicycle,* 305 F.3d 894, 912, n.14 (holding that a bicycle manufacturer's

"TREK" trademark was suggestive, because "'trek' means a long journey, and one can undertake a

long journey on a bicycle").  Here, TG's ballerina word mark evokes the slimness and grace of

ballerinas, which would lead the purchaser to conclude that TG's product, an herbal dietary

supplement, is associated with those desired characteristics.  Though suggestive marks like TG's

word mark are not afforded as much protection as arbitrary or fanciful marks, they still receive

automatic protection, absent any secondary meaning.[3]  *See Sleekcraft,* 599 F.2d at 349 (stating that,

"[a]lthough less distinctive than an arbitrary or fanciful mark and therefore a comparatively weak

mark, a suggestive mark will be protected without proof of secondary meaning").

The length of time that TG has used its word mark in the marketplace further establishes the

strength of the mark.  TG alleges in its complaint that it has been selling tea under the 3

BALLERINA word mark since at least August 2000.  *See* Compl. ¶ 8.  Thus, the status of this mark

as a suggestive mark, coupled with the duration of its use in the marketplace, establishes that it is a

relatively strong mark, which makes consumer confusion more likely.  *See Joujou Designs, Inc. v.*

*Jojo Ligne Internationale*, 821 F. Supp. 1347, 1353-54 (N.D. Cal. 1992) (referring to plaintiff's

well-established use of the mark in advertising and sales since 1977 as "compelling evidence of the

strength of the mark").

---

[3] Arguably, TG's word mark is an arbitrary, rather than suggestive, mark, in which case the mark
would be given even more protection.  *See id.*  Arbitrary marks are those that involve common words
or designs that have no connection to the product, but are used to create a distinctive mark which
identifies the source of the product, such as the use of Dutch Boy on a can of paint.  *See Dreamwerks*
*Prod. Group v. SKG Studio,* 142 F.3d 1127, 1131 n.7 (9th Cir. 1998).  In the instant case, a ballerina
does not automatically have a connection to tea.  The word mark at issue, however, seems more
appropriately deesignated a suggestive mark because the tea product at hand is actually a dietary drink.

**United States District Court**
For the Northern District of California

ii. <u>Proximity or Relatedness of Goods</u>

The second factor, the proximity or relatedness of TG's 3 BALLERINA tea and Twinstar's SLIM BALLERINA tea, also points toward a likelihood of confusion. The more related or complementary goods are, the higher the danger of consumer confusion. *See Gallo Cattle,* 967 F.2d. at 1291. Here, the infringed mark and infringing mark appear on identical goods -- tea products. More specifically, both products bear the label "Dieter's Drink," which indicates that they are a specific type of dietary tea product. *See* Hansen Decl., Exs. 1, 5 (color copies of 3 BALLERINA and SLIM BALLERINA tea packages).

iii. <u>Similarity of Sight, Sound, and Meaning of Marks</u>

The third factor -- namely, the similarity of the sight, sound, and meaning of the marks -- also supports a finding of a likelihood of confusion. Where, as here, the products bearing the disputed marks are identical, even less similarity is required to demonstrate a likelihood of confusion. *See AMF,* 599 F.2d at 350 ("Although the Sleekcraft boat is for higher speed recreation and its refinements support the market distinction the district court made, they are so closely related that a diminished standard of similarity must be applied when comparing the two marks."). Given this lower standard, TG has adequately demonstrated that the word marks are similar.

Marks should be compared based on their sight, sound, and meaning as they appear in the marketplace, and similarities between marks should be weighed more heavily than differences. *See Sleekcraft*, 599 F.2d. at 351. TG has submitted color photocopies of its 3 BALLERINA tea packaging and Twinstar's SLIM BALLERINA tea packaging. *See* Hansen Decl., Exs. 1, 5.

Under the lower standard for marks used for identical products, Twinstar's SLIM BALLERINA word mark is sufficiently similar to TG's 3 BALLERINA word mark in sight, sound, and meaning. *See Sleekcraft*, 599 F.2d at 350-51 (finding that defendant's SLEEKCRAFT mark infringed upon plaintiff's SLICKCRAFT mark because the two marks were "quite similar" in sight, sound, and meaning). On a visual level, both TG and Twinstar's packaging feature the word "ballerina" in white lettering on a green background. *See* Hansen Decl., Exs. 1, 5; *see also S.C. Johnson & Son v. Drop Dead Co.,* 210 F. Supp. 816, 817 (S.D. Cal. 1962) (finding trademark infringement because label on defendant's product used not only the word mark in question, but also

the same color scheme as plaintiff's label). Even though the fonts used by TG and Twinstar are different, and the shades of green quite different, *see* Hansen Decl., Exs. 1, 5, the overall visual impact weighs in favor of similarities rather than differences.[4]

As for sound and meaning, it is significant that the TG's word mark "3 BALLERINA" differs from "SLIM BALLERINA" by the beginning modifying word – "3" versus "Slim"– which makes the marks fairly different. "3" refers to the number of ballerinas featured in TG's design mark, while "slim" is a general modifier that could both refer to the design mark and to the desired result of drinking Twinstar's tea. However, as TG points out, the phrase "3 BALLERINA" is literally translated in Chinese on its packaging. *See* Hansen Decl., Exs. 5, 9 (photocopy of 3 BALLERINA tea package and letter to U.S. Customs and Border Protection). In contrast, Twinstar's tea packaging does not bear a full Chinese translation of "SLIM BALLERINA," but instead features the Chinese phrase meaning "ballerina" without the modifier "slim." *See id.* Twinstar's use of the Chinese phrase meaning "ballerina," and not "slim ballerina," thus emphasizes the centrality of the word "ballerina" on its packaging and makes TG and Twinstar's packages more similar. *See id.* More importantly, the common word "ballerina" appears to dominate the mark, at least more so than the differing elements of "3" and "slim."

Taking into account the similarities in sight, sound, and meaning, the word marks "3 BALLERINA" and "SLIM BALLERINA" are quite similar, which makes consumer confusion more likely.

iv.    <u>Degree to Which Marketing Channels Converge</u>

In considering the marketing channels used by TG and Twinstar, the Court finds that the channels largely overlap, which makes consumer confusion more likely. *See Gallo Cattle,* 967 F.2d. at 1291. Both 3 BALLERINA tea and SLIM BALLERINA tea feature Chinese and English language labels on its packaging, indicating that they are geared toward customers who read and understand Chinese. *See* Hansen Decl., Exs. 1, 5, 9. Furthermore, TG has represented that both TG

---

[4] Of course, Twinstar's use of green on its packaging is not altogether damning, as tea leaves are often green.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  and Twinstar both market their tea in Asian grocery stores throughout the United States, thus

2  reaching the same type of potential consumer.  *See* Ly Decl. ¶ 3.

3                    v.    Type of Goods and Degree of Care Consumers Are Likely to Exercise

4                          in Purchasing Goods

5        The goods in question in the instant case are tea products that are relatively inexpensive.

6   *See* Hansen Decl., Exs. 14, 15 (receipt for Twinstar SLIM BALLERINA tea indicating price of

7  $1.69 per box, and printout from website selling Twinstar SLIM BALLERINA tea indicating price

8  of $1.00 per box).  Thus, the presumption that buyers of expensive products exercise greater care is

9  not applicable here.  *See Sleekcraft,* 599 F.2d at 353.  The Court finds that this factor weighs in favor

10 of a likelihood of confusion because purchasers of tea are not likely to exercise more than ordinary

11 care in their purchases.

12                   vi.    Intent of the Defendant in Selecting the Allegedly Infringing Mark

13       Though bad intent is not necessary to demonstrate a likelihood of confusion, where the

14 plaintiff establishes that defendant knowingly used an infringing mark, there is a presumption that

15 the infringer will accomplish his purpose, and the public will be deceived.  *See Sleekcraft,* 599 F.2d

16 at 354.  The Court concludes that there is insufficient evidence in the record to support a finding that

17 Twinstar knowingly selected infringing marks, and therefore this factor does not weigh in favor of a

18 likelihood of confusion.

19       The facts herein are distinguishable from cases where there was a purposeful effort to take

20 advantage of another's mark.  In *Fleischmann Distilling v. Maier Brewing,* the Ninth Circuit

21 concluded that where defendant, a beer manufacturer, knew of the popularity of plaintiff's "Black &

22 White" trademark for Scotch and then adopted it for defendant's beer product, defendant's "only

23 possible purpose" for doing so was to capitalize on plaintiff's popularity.  *See Fleischmann*

24 *Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 157  (9th Cir. 1963).  In that case, defendant's

25 employees had openly acknowledged that they knew that plaintiff's Black & White scotch was one

26 of the most popular brands in the market.  *See id.*  Similarly, in *Gallo Cattle,* the Ninth Circuit found

27 that defendant, a seller of cheese, intentionally took advantage of the goodwill associated with

28 plaintiff's GALLO mark, used for wine.  *See Gallo Cattle,* 967 F.2d at 1292.  Before launching his

United States District Court

For the Northern District of California

1   product, defendant, whose surname was also Gallo, had told plaintiff that he would not use GALLO

2   as a trademark.  *See id.*  However, after a sales manager and label designer recommended that

3   defendant use his surname, Gallo, defendant began to sell cheese under the JOSEPH GALLO mark.

4   *See id.*  The Ninth Circuit affirmed the finding that these facts demonstrated an intent to deceive,

5   which contributed to a likelihood of confusion.  In a third case, a district court found that the

6   defendant, a clothing manufacturer, intended to infringe by trading off the popularity of plaintiff's

7   preexisting mark.  *See Joujou Designs,* 821 F. Supp. at 1355.  The district court doubted the

8   credibility of defendant's claim that he knew nothing of plaintiff's mark, since the defendant was a

9   participant in the same market for women's clothing, and plaintiff was well-established and had

10  advertised extensively in the same California women's clothing market.  *See id.*  Furthermore, the

11  court found that a strong inference existed that defendant not only knew of plaintiff's mark, but had

12  the intent to infringe and trade off its popularity, because of the similar appearance, placement,

13  sound and feel of defendant's mark.  *See id.*

14       In this case, TG has not adequately demonstrated that Twinstar adopted its SLIM

15  BALLERINA word mark in order to trade off of TG's popularity.  Unlike the plaintiffs in

16  *Fleischmann* and *Gallo Cattle,* TG has not produced any evidence that Twinstar or any of its

17  employees actually knew of 3 BALLERINA tea and made statements about its popularity before

18  launching SLIM BALLERINA tea.  *See Fleischman,*314 F.2d 149, 157; *see also Gallo Cattle,* 967

19  F.2d at 1292.  Additionally, although TG claims it has been using its 3 BALLERINA word mark

20  since August 2000 and its ballerina design mark since May 1991, *see* Compl. ¶¶ 8, 15, TG has not

21  demonstrated the popularity of its products or its share of the tea market.  Though the president of

22  TG has claimed that 3 BALLERINA tea is "well-known in the marketplace," *see* Ly Decl. ¶ 2, it

23  does not support this claim, other than claiming that the tea has been widely distributed, *see* Hansen

24  Decl., Ex. 9 (TG letter to U.S. Customs and Border Protection), and that TG has long-standing

25  relationships with Asian grocery stores nationwide.  *See* Ly Decl. ¶ 2.  *Compare Joujou Designs,*

26  821 F. Supp. at 1355 (where the district court found that given plaintiff's $25 million in California

27  sales and extensive advertising, the defendant knew of plaintiff's name mark).  Furthermore,

28  Twinstar's word mark is similar to TG's, but not nearly identical like the "JOUJOU" and "JOJO"

United States District Court

For the Northern District of California

marks in *Joujou Designs,* whose nearly identical nature raised a strong inference of intentional

infringement . *See* 821 F. Supp. at 1355.

The Court also notes that any constructive notice Twinstar might have from TG's registration

of its word mark is insufficient, without additional evidence of intent, to demonstrate that Twinstar

knowingly adopted TG's mark.  *See M2 Software,* 421 F.3d at 1075 (citing 3 McCarthy § 23:109

("The existence of constructive notice [of a plaintiff's registration] is not evidence that a later user

necessarily intended to confuse"), to counter plaintiff's claim that constructive notice was sufficient

to demonstrate bad intent); *see also Health Net v. U.S.A. Healthnet, Inc*., No. CV 92-3925, 1993

U.S. Dist. LEXIS 21126, *23 (C.D. Cal. Jan.13, 1993) (in determining whether defendant had

requisite intent and "knowingly" adopted the mark, "the term 'knowingly' requires more than

'constructive knowledge' from a previously registered mark").  In cases where constructive notice is

taken into account to determine intent, it is only one of numerous factors that contribute to that

finding.  *See, e.g.*, *Discovery Communications, Inc. v. Animal Planet*, 172 F. Supp. 2d 1282, 1290

(C.D. Cal. 2001) (finding bad intent based on defendant's constructive notice from plaintiff's federal

trademark registrations, defendant's identical mark, and defendant's continued and increased use of

the mark after assuring plaintiff it would cease use); *Qwest Communs. Int'l v. Oneqwest*, No.

CO2-829R, 2002 U.S. Dist. LEXIS 25469, *24 (W.D. Wash. 2002) (finding bad intent based on

several circumstances surrounding defendant's use, such as defendant's constructive notice from

previous registration and the complete adoption of plaintiff's strong mark, where defendant even

adopted the arbitrary spelling of  "QWEST" used by plaintiff).

> vii.    Evidence of Actual Confusion  and Likelihood that the Parties Will
> Expand Their Product Lines

The two remaining factors used to determine if a likelihood of confusion exists are whether

evidence of actual confusion exists and the likelihood that parties will expand their product lines.

*See Sleekcraft,* 599 F.2d at 348-349.   TG has not provided any evidence as to either of these factors,

and accordingly, they do not factor into the Court's analysis of likelihood of confusion.

viii.   Conclusion

Of the eight factors above, all but the last three weigh in favor of a likelihood of confusion. Thus, the Court concludes that, taking all allegations in the complaint as true, TG has adequately demonstrated that its 3 BALLERINA word mark would likely be confused with Twinstar's SLIM BALLERINA word mark. *See id.* at 354 (noting that bad intent is not required for a finding of likelihood of confusion).

b.   Design Mark

The Court finds that TG has adequately demonstrated not only a likelihood of confusion with respect to its word mark but also a likelihood of confusion with respect to its design mark. In fact, most of the analysis above regarding TG's word mark is applicable to the analysis here regarding the design mark. The main differences between the two analyses are: (1) the similarity between TG's design mark and Twinstar's design mark and (2) Twinstar's intent in selecting the allegedly infringing design mark.

i.   Strength of the Allegedly Infringed Mark

Like the 3 BALLERINA word mark, TG's ballerina design mark is a strong mark, which supports a finding of likelihood of confusion. TG's design mark is suggestive when used in connection with the sale of tea or, more specifically, dietary tea. *See* Part II.B.2.a.i, *supra*. Like the 3 BALLERINA word mark, TG's ballerina design mark evokes the slimness and grace of ballerinas, which would lead the purchaser to conclude that TG's product, an herbal dietary supplement, is associated with those desired characteristics. Furthermore, TG has used its design mark in commerce even longer than its word mark. TG has used its ballerina design mark on its tea since 1991, *see* Compl. ¶ 15, while it has used its word mark since August 2000. *See* Compl. ¶ 8; *see also Joujou Designs, Inc. v. Jojo Ligne Internationale*, 821 F. Supp. at 1353-54 (plaintiff's well-established use of the mark in advertising and sales since 1977 was "compelling evidence of the strength of the mark").

ii.   Proximity or Relatedness of the Goods

The ballerina design mark is used on Twinstar's SLIM BALLERINA tea, and more recently, on Twinstar's TWINSTAR SLIM TEA. *See* Hansen Decl. Exs. 5, 24 (photocopies of SLIM

United States District Court

For the Northern District of California

1  BALLERINA and TWINSTAR SLIM TEA packaging). Both products featuring the infringing

2  design mark are tea products, and specifically, dietary tea products. These Twinstar products are

3  identical to TG's tea, or more specifically, dietary drink product. This factor thus supports a finding

4  of likelihood of confusion. *See Gallo Cattle,* 967 F.2d. at 1291 (holding that the more related or

5  complementary goods are, the higher the danger of consumer confusion).

6                                    iii.     Similarity of the Sight, Sound, and Meaning of the Marks

7         Under the lower standard applied to marks used on identical products, Twinstar's ballerina

8  design mark is sufficiently similar to TG's ballerina design mark to support a likelihood of

9  confusion determination -- although this is a closer question than the similarity of Twinstar's word

10 mark to TG's word mark. The drawing on TG's package features the silhouettes of three ballerinas,

11 arms outstretched in dancing poses, poised atop a teacup. *See* Hansen Decl., Ex. 1. The drawing on

12 Twinstar's packages -- both the SLIM BALLERINA tea and the TWINSTAR SLIM tea -- features

13 the silhouettes of two ballerinas, arms outstretched in dancing poses. *See* Hansen Decl., Exs. 5, 24.

14 Both TG and Twinstar's packaging feature multiple ballerinas in dancing poses, and both

15 companies' packaging feature silhouetted figures in black, placed against a green background. *See*

16 Hansen Decl., Exs. 1, 5; *see also S.C. Johnson & Son,* 210 F. Supp. at 817 (finding that the

17 similarity of the color scheme defendant used contributed toward a finding of infringement).

18 Though the design marks are different (based on the number of ballerinas features, their exact

19 positions, and the absence of a teacup in Twinstar's design), the similarities outweigh the

20 differences, and the similarities are heightened when the design marks are viewed in conjunction

21 with the word marks. *See Brookfield Communications, Inc. v. West Coast Entm't Corp.,* 174 F.3d at

22 1054-55 (stating that "the marks must be considered in their entirety and as they appear in the

23 marketplace, with similarities weighed more heavily than differences").

24                                iv.     Degree to Which the Parties' Marketing Channels Converge

25        The tea products featuring the parties' design marks are the same as the products featuring

26 the parties' word marks. Thus, just as the marketing channels of the products featuring the parties'

27 word marks largely overlap, the marketing channels of the products featuring the ballerina design

28 marks overlap, which makes consumer confusion more likely. *See* Part II.B.2.a.iv, *supra.*

United States District Court

For the Northern District of California

v.    Type of Goods and Degree of Care Consumers Are Likely to Exercise in Purchasing Them

The goods featuring the design mark are the same as the goods featuring the word mark; thus, this factor weighs in favor of a likelihood of confusion, as purchasers of inexpensive tea are unlikely to exercise particular care in their purchases. *See* Part II.B.2.a.v., *supra.*

vi.    Intent of the Defendant in Selecting the Allegedly Infringing Mark

As to Twinstar's original packaging, TG has not produced evidence supporting a finding of bad intent in selecting the design mark, for the same reasons discussed above in regards to the word mark. *See* Part II.B.2.a.vi., *supra.* TG presents no evidence that Twinstar selected the design mark for its SLIM BALLERINA tea in an attempt to trade on TG's popularity. *See id.*

As to the altered packaging, *see* Hansen Decl., Exs. 11, 24, TG presents no evidence demonstrating that Twinstar retained the design mark on its altered TWINSTAR SLIM TEA packaging in an attempt to capitalize on TG's popularity. In its December 2004 cease and desist letter, TG did not mention the design mark, only the word mark. The evidence provided by TG indicates that Twinstar altered its packaging to avoid litigation with TG, *see* Hansen Decl., Exs. 11, 24 (containing letters from Twinstar's counsel expressing the expectation that this new packaging would avert litigation, as it bears no similarity to TG's product), and TG does not point to any evidence indicating that Twinstar was attempting to trade off of the recognition of TG's ballerina design mark.

vii.    Evidence of Actual Confusion and Likelihood that the Parties Will Expand Their Product Lines

TG presents no evidence of actual confusion or evidence suggesting a likelihood that parties will expand their product lines. Thus, these factors do not weigh into the Court's analysis of likelihood of confusion of the design marks.

viii.    Conclusion

Because five of the eight factors discussed above weigh in favor of a likelihood of confusion, the Court finds that Twinstar's design mark is likely to be confused with TG's design mark. Though

16

United States District Court

For the Northern District of California

1  the question is closer than in the case of the parties' word marks, the likelihood of confusion

2  persists.

3       According, because both Twinstar's word mark and design mark are likely to be confused

4  with TG's marks, TG has sufficiently established its claims for trademark infringement, and its

5  additional federal, common law, and state law claims, and satisfies the second and third *Eitel* factors.

6  *See Eitel,* 782 F.2d at 1471-72.

7       4.   <u>Sum of Money at Stake in the Action</u>

8       Under the fourth *Eitel* factor, the Court considers the amount of money at stake.  Default

9  judgment is disfavored where the sum of money at stake is too large or unreasonable in light of

10  defendant's actions.  *See Totten v. Hurrell,* No. 00-2718, 2001 U.S. Dist. LEXIS 20259, *2 (N.D.

11  Cal. Nov. 28, 2001) (stating that "the 'sum of money at stake' factor [under *Eitel*]  is meant to focus

12  on the size of the award requested, as courts are hesitant to enter default judgments where large

13  sums of money are at stake"); *see also Board of Trustees of the Cal. Metal Trades v. Peter,* No. 00-

14  0395, 2000 U.S. Dist. LEXIS 19065,*5 (N.D. Cal., Dec. 29, 2000) (holding that this factor favors

15  entry of default where "[t]he amount at stake is minor in comparison to the potential loss...as a result

16  of defendants' conduct").  The Court considers Plaintiff's declarations, calculations, and other

17  documentation of damages in determining if the amount at stake is reasonable.  *See Walters v.*

18  *Shaw/Guehnemann Corp.*, 2004 U.S. Dist. LEXIS 11992, at *7 (finding plaintiff's calculations of

19  damages and attorney fees reasonable, based on plaintiff's sworn declarations and pay stubs and

20  other documentation submitted by plaintiffs).

21       In the present case, TG seeks recovery of approximately $100,174:  $67,200 in damages,

22  $31,113 in attorney's fees, and $1,861 in litigation costs.  *See* Mot. at 6-8.  As discussed below,

23  however, the Court finds TG failed to prove up the amounts sought.  In view of the Court's

24  recommendation below, the sum of money sought by TG is unreasonable, because it is unsupported

25  by the evidence on the record, and this factor therefore weighs against default.  *Cf. Walters v.*

26  *Shaw/Guehnemann Corp.*, 2004 U.S. Dist. LEXIS at *8-9 (where the amount of damages was

27  supported by pay stubs and other documentation).  On the other hand, given the Court's

28  recommendation against an award of damages (at least on this record), this factor may be mitigated.

**United States District Court**
For the Northern District of California

5.      <u>Possibility of a Dispute Concerning Material Facts</u>

Twinstar has not filed an answer in response to TG's complaint, and therefore, a dispute concerning material facts as to infringement is unlikely. As the Clerk of the Court has already entered default, the Court takes all well-pleaded facts, except those pertaining to damages, as true. *See Televideo,* 826 F.2d at 917-18. Furthermore, evidence submitted by TG in support of its motion for default judgment -- in particular, correspondence between TG and Twinstar -- supports TG's account of the events. Though there is a possibility of dispute as to the amount of damages, there is little possibility of dispute as to Twinstar's liability for damages.

6.      <u>Possibility of Excusable Neglect</u>

There is little possibility of excusable neglect. Twinstar was duly served with the complaint and summons as discussed above. This suit followed more than a year of correspondence between the parties. Furthermore, in informal correspondence, TG informed Twinstar of its intention to request default judgment, *see* Hansen Decl., Ex. 21 (letter from TG counsel to Twinstar president, Kei Sing Ma), and gave Twinstar an opportunity to file an answer even after the expiration of the court's deadline. *See id*; *see also Philip Morris U.S.A, Inc. v. Castworld Products Inc.* 219 F.R.D. 494, 501 (C.D. Cal. 2003) (finding that the possibility of excusable neglect was remote, where defendant received notice of complaint and motion for default judgment, but failed to respond to either, and "[i]n light of the multiple notices delivered to Defendant regarding the pending lawsuit, the extended period of time that has elapsed, and Defendant's resistance to Plaintiff's attempts to resolve this matter through settlement). *Compare Eitel,* 782 F.2d at 1472 (finding that defendant's failure to answer was attributable to excusable neglect, where defendant reasonably believed that litigation had been ended when parties reached a settlement agreement prior to the deadline for filing an answer).

In light of the facts above, the Court finds that there is little possibility of excusable neglect, and this factor therefore weighs in favor of granting default judgment.

///

///

///

**United States District Court**
For the Northern District of California

1    7.    <u>Strong Policy Favoring Decisions on the Merits</u>

2    Though default judgment is disfavored, and "[c]ases should be decided upon their merits

3    whenever reasonably possible," this preference for adjudication on the merits, standing alone, is not

4    dispositive. *See Pepsico Inc. v. Cal. Sec. Cans,* 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002)

5    (internal citations omitted).  When a defendant like Twinstar fails to defend an action by submitting

6    an answer to plaintiff's complaint, a judgment on the merits is impractical, if not impossible. *See*

7    *Castworld Products,* 219 F.R.D. at 501 (quoting *Pepsico*, 238 F. Supp. 2d at 1177).

8    8.    <u>Summary of *Eitel* Factors</u>

9    The Court finds that, in light of the *Eitel* factors as a whole, default judgment against

10   Twinstar is appropriate.  *See Eitel,* 782 F.2d at 1471-72.  In brief, (1) failure to grant default

11   judgment would prejudice TG; (2) and (3) TG's trademark infringement and other claims are

12   meritorious and sufficiently alleged as to both its word mark and design mark; (5) there is little

13   possibility of dispute concerning material facts; and (6) Twinstar's default does not appear to be due

14   to excusable neglect.  These factors overcome the fourth *Eitel* factor, the reasonableness of the

15   amount of money at stake (potentially mitigated by the actual award recommended herein), and the

16   seventh factor favoring decisions on the merits weigh against default judgment.  The Court takes

17   into account its finding as to the fourth *Eitel* factor in its discussion of damages and fees below.

18   C.   <u>Damages and Injunctive Relief</u>

19   In granting default judgment, a court can award only up to the amount prayed for by a

20   plaintiff in its complaint.  Fed. R. Civ. Pro. 54(c).  A demand for relief must be specific, under FRCP

21   8(a)(3), and plaintiff must "prove up" the amount of damages it is claiming.  *See Castworld*

22   *Products*, 219 F.R.D. at 501.  In the instant case, TG seeks from Twinstar: (1) damages in the

23   amount of $67,200; (2) attorney's fees totaling $31,113; (3) costs of litigation totaling $1,861; and

24   4) permanent injunctive relief and the surrender for destruction of infringing materials.  *See* Mot. at

25   6-9.  TG demands each of these forms of relief in its complaint.  *See* Compl. at 7-8 (listing relief

26   prayed for).

27

28

**United States District Court**
For the Northern District of California

In reviewing TG's requests for relief, the Court notes that although factual allegations relating to liability are taken as true upon entry of default, allegations as to amount of damages are not automatically accepted. *See TeleVideo,* 826 F.2d at 917-18.

      1.   <u>Damages</u>

TG seeks damages in the amount of Twinstar's profits from its sale of SLIM BALLERINA tea, which TG estimates at $67,200. *See* Mot. at 5-6. A plaintiff whose federally registered trademark is violated may recover its lost sales, the defendant's profits, and the costs of the action. *See* 15 U.S.C. § 1117(a). Monetary damages only benefit the plaintiff, and not consumers at large, so a higher standard of proof is injury is required. *See Taylor Made Golf Co., Inc. v. Carsten Sports, Ltd.,* 175 F.R.D. 658, 661-62 (S.D. Cal. 1997) Furthermore, monetary damages cannot be merely speculative or punitive; they can only be issued for actual injury caused. *See id.* Furthermore, it is the burden of the plaintiff, TG, to prove one or both of the following measures of damages: its lost sales or defendant's gross profits from infringing activity with reasonable certainty. *See Lindy Pen Co. v. Bic Pen Corp.,* 982 F.2d 1400, 1408 (9th Cir. 1993) (the court refused to award damages where plaintiff was "unable or unwilling to present competent evidence of its lost profits or [defendant's] unjust enrichment arising from the infringement"). In cases such as this one, where defendant and plaintiff are direct competitors, Twinstar's profits from its sales of SLIM BALLERINA tea are a measure for Plaintiff TG's damages. *See Polo Fashions, Inc. v. Craftex, Inc.,* 816 F.2d 145, 149 (4th Cir. 1987) (holding that where defendant infringed upon plaintiff's polo horse and rider symbol, defendants' profits where "probably the best possible measure of damages available"). Thus, TG's use of Twinstar's profits as a proxy for damages is appropriate. *See* Mot. at 5-6.

Here, TG provides an estimation of Twinstar's profits based on Twinstar's alleged admission that it sold $12,000 of SLIM BALLERINA tea during a two-month period. *See* Mot. at 6. Thus, TG estimated that the monthly intake from SLIM BALLERINA tea was $6,000. *See id.* TG then multiplied this $6,000 monthly profit by 56 months, which TG alleged to be a conservative estimate of the number of months Twinstar sold the tea. TG arrived at the 56-month period by measuring the time between Twinstar's date of incorporation on April 5, 2002 to October 20, 2006, the date on

United States District Court

For the Northern District of California

1   which TG last found SLIM BALLERINA tea for sale online. *See id.* TG thus calculated that the

2   total intake from SLIM BALLERINA sales was equivalent to $336,000. *See id.* By multiplying this

3   total, $336,000, by their claimed industry standard profit margin of 20%, TG arrived at the final

4   estimate that Twinstar reaped a total profit of $67,200 over the 56-month period it sold SLIM

5   BALLERINA tea. *See id.*

6        The Court finds three problems with the above listed calculations. First, TG does not

7   adequately support its allegation that Twinstar sold SLIM BALLERINA tea for at least 56 months.

8   TG does not provide evidence to support its allegation that Twinstar began to sell SLIM

9   BALLERINA tea around the time of its incorporation on August 5, 2002. *See Mot.* at 6. In fact,

10  based on evidence submitted by TG, the earliest that Twinstar began selling SLIM BALLERINA

11  was some time in 2003. *See* Hansen Decl., Ex. 9 (letter from TG to U.S. Customs and Border

12  Protection, indicating that Twinstar began selling SLIM BALLERINA around 2003); *see also* Ly

13  Decl. ¶ 3 ("My distributor told me he had seen SLIM BALLERINA tea for sale since at least

14  2003."). TG provides no evidence that SLIM BALLERINA was sold before 2003. In addition, even

15  assuming Twinstar began selling SLIM BALLERINA tea on April 5, 2002, and stopped selling the

16  tea on October 20, 2006, *see* Hansen Decl., Ex. 15 (printout dated October 20, 2006, containing list

17  of items sold by Ecomeal.org, including Twinstar SLIM BALLERINA tea),  this period measures a

18  total of fifty-four and one-half months, not fifty-six months, according to the Court's calculations.

19  *See* Mot. at 6.

20       Second, TG bases its calculation of Twinstar's profit on TG president's claim that the

21  standard industry profit margin is 20%. *See* Mot. at 6 (citing to Ly Decl. ¶ 5). However, TG fails to

22  provide enough evidence to explain why TG's president is qualified to opine on this 20% standard.

23       Finally, and most significantly, although TG alleges that Twinstar has admitted that it sold

24  $12,000 of Slim Ballerina tea over a two-month period in 2004, *see* Mot. at 6, TG provides no

25  evidence demonstrating this admission. Specifically, the exhibit cited in TG's motion as providing

26  Twinstar's admission of its two-month sales totaling $12,000 does not mention any profit figures at

27  all. *See* Mot. at 6 (referring to Hansen Decl., Ex. 24, a 5/15/06 letter from Twinstar's intellectual

28  property counsel Myron Amer). As TG provides no alternative estimation of Twinstar's monthly

United States District Court

For the Northern District of California

1   sales of SLIM BALLERINA tea, the Court cannot grant damages based on profits derived from

2   these missing sales figures.  *See Lindy Pen,* 982 F.2d at 1408 (refusing to grant damages where

3   plaintiff failed to establish with reasonable certainty its own lost sales or defendant's profits from

4   infringing conduct).  Though at least one district court has suggested that the standard of proof for

5   defendant's profits may be more relaxed in cases where defendant does not appear or participate in

6   litigation, the Court refuses to grant damages where, as here, there is a complete lack of

7   documentation providing a starting point for TG's calculations.  *See Taylor Made Golf,* 175 F.R.D.

8   at 663 (where the district court granted default judgment to a plaintiff trademark holder and noted

9   that plaintiff might have a relaxed standard of proof for defendant's actual profits, where a defendant

10  refused court summons or was otherwise entirely uncooperative; the court granted plaintiff's

11  approximate calculations of defendant's profits from sale of counterfeit golf clubs; based on rough

12  estimations of Taiwanese golf club exports and the defendant's share of that market).

13      FRCP 55(b) states, in relevant part,

14          If, in order to enable the court to enter judgment or to carry it into
            effect, it is necessary to take an account or to determine the amount of
15          damages or to establish the truth of any averment by evidence or to
            make an investigation of any other matter, the court may conduct such
16          hearings or order such references as it deems necessary and proper.

17  Fed. R. Civ. P. 55(b).  In the Ninth Circuit, it is established that "a default judgment for money may

18  not be entered without a hearing unless the amount claimed is a liquidated sum or capable of

19  mathematical calculation."  *See Davis v. Fendler*, 650 F.2d 1154, 1161 (9th Cir. 1981).

20      Thus, instead of ordering Twinstar to pay damages, the Court grants the alternative relief TG

21  requested in its motion for default judgment, *see* Mot. at 7, and orders Twinstar to account for its

22  sales of SLIM BALLERINA tea and provide the financial information necessary to establish an

23  accurate amount of profits gained from its sales of SLIM BALLERINA tea.  *See Pickern v.*

24  *Marino's Pizza & Italian Restaurant*, No. S-01-1096, 2003 U.S. Dist. LEXIS 26951, at *3-4 (E.D.

25  Cal. Feb. 24, 2003) (where the court entered default judgment against defendant, who never

26  answered plaintiff's complaint and never appeared in court, and whose only participation in the

27  litigation was sending an unverified letter to the court apparently opposing default; the court ordered

28  both parties to submit evidence in the form of affidavits or declarations that demonstrated the fact

1   and amount of damages, because the amount of damages claimed by plaintiff was not liquidated or

2   capable of mathematical calculation).  TG is not precluded from providing other evidence to the

3   Court to prove any other measure for damages.

4          2.      Attorney's Fees

5          The Lanham Act gives the court discretion to award reasonable attorney's fees in exceptional

6   cases.  See 15 U.S.C. § 1117(a).  Though not explicitly defined in the Lanham Act, a trademark case

7   may be "exceptional" and may merit attorney's fees where the defendant's infringement is

8   "malicious, fraudulent, deliberate, or willful."  See Lindy Pen, 982 F.2d at 1409.  In addition, some

9   courts have indicated that a failure by a plaintiff to demonstrate any actual economic damages

10  weighs against finding a case "exceptional."  See Ferrero U.S.A., Inc. v. Ozak Trading, Inc., 952

11  F.2d 44, 47 (3d Cir. 1991) (indicating that a failure to prove damages can render a case

12  unexceptional); Pyramid Tech. Corp. v. Pyramid Tech., No. 92-3347, 1993 U.S. Dist. LEXIS 10946,

13  at *9 (E.D. La. July 30, 1993) (finding a case unexceptional because of "[t]he utter absence of any

14  proof of actual economic loss together with the complete absence of other evidence of 'willful' or

15  'fraudulent' intent or conduct on the part the defendants").[5]

16         An example of the type of "exceptional" case that merits attorney's fees is found in

17  Earthquake Sound Corp. v. Bumper Indus., 352 F.3d 1210 (9th Cir. 2003), in which the Ninth

18  Circuit held the "total picture in the case was one of deliberate, willful infringement."  Id. at 1219.

19  In affirming the district court's finding of willful infringement, the appellate court noted that the

20  question of infringement was "not a particularly close case on the question of infringement," as

21  defendant knew of plaintiff's mark for three years before applying for its own mark's registration,

22

23  _____

          [5] In Taylor Made Golf, the court held that a case may also be deemed "exceptional" because of
24  a defendant's disregard of the court proceedings and failure to appear.  See Taylor Made Golf, 175
    F.R.D. at 663 (citing Lien v. Compusoft of Kalamazoo, Inc., No. 1:89-CV-104, 1991 U.S. Dist. LEXIS
25  3218, at *13-14 (W.D. Mich. Mar. 13, 1991)).  Several courts in the Central and Southern Districts of
    California have cited Taylor Made Golf approvingly for this proposition.  However, in Lien -- the case
26  on which Taylor Made Golf relied to arrive at this conclusion -- the court actually found the case
    "exceptional" not solely on the basis of defendant's disregard of the judicial process, but also because
27  of willful behavior on the defendant's part.  See Lien, 1991 U.S. Dist. LEXIS 3218, at *13-14.  The
    court referred to defendant's complete disregard of plaintiff's trademark rights and the string of broken
28  promises during five months of negotiations,  which "essentially invited plaintiff to institute [the]
    action."  See id.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  and plaintiff had provided ample evidence of actual confusion.  *See id.* at 1217-18.  To support its

2  finding of willful and deliberate infringement, the court further noted that the defendant did not

3  establish that it took reasonable measures, such as consulting an attorney, when informed by

4  plaintiff of possible infringement.  *See id.*  The infringing defendant was continually notified of the

5  problem by plaintiff, but defendant refused plaintiff's offer to settle the matter without litigation, and

6  instead continued to market the infringing products.  *See id.*

7      Here, the Court finds that Twinstar's infringement was not so malicious, fraudulent,

8  deliberate, or willful as to make it an "exceptional" case.  *See Lindy Pen,* 982 F.2d at 1409 (where

9  defendant's infringement was not intentional, and no other factors suggested the case was

10  "exceptional").  First, as stated above in the discussion on likelihood of confusion, TG has not

11  adequately demonstrated that Twinstar intentionally selected TG's marks in order to capitalize on

12  TG's popularity.  *See Moore Business Forms v. Ryu*, 960 F.2d 486, 492 (5th Cir. 1992) (denying

13  attorney's fees because the case was not exceptional, where defendant did not adopt the mark in bad

14  faith, and though plaintiff notified defendant of possible infringement, defendant's post-notification

15  conduct did not demonstrate bad faith); *cf. Earthquake Sound,* 352 F.3d at 1217 (willful

16  infringement found, in part because defendant knew of plaintiff's mark for at least three years before

17  defendant attempted to register its own highly similar mark, and thus adopted the mark in bad faith).

18      Second, though TG did send Twinstar repeated cease-and-desist letters, the record indicates

19  that Twinstar was responsive to these letters and made attempts to reach an understanding with TG

20  and avoid litigation --  unlike the defendant in *Earthquake Sound*, who continually ignored

21  plaintiff's correspondence and rejected plaintiff's offer to settle out of court.  *See id*; *see also* Hansen

22  Decl., Exs. 7-13 (correspondence between TG and Twinstar).  Twinstar's responsiveness suggests a

23  lack of willfulness or bad faith.  For example, in its early correspondence with TG, Twinstar stated

24  that it was ceasing production of SLIM BALLERINA tea, though it acknowledged that some supply

25  of the tea might still be available for sale.  *See* Hansen Decl., Ex. 10 (1/8/05 letter from Twinstar

26  counsel stating that Twinstar had ceased production and distribution of its SLIM BALLERINA tea

27  products, though a small quantity of products might still be in the marketplace).  One year later, on

28  January 19, 2006, Twinstar again represented to TG that it had no SLIM BALLERINA tea in its

United States District Court

For the Northern District of California

1   inventory.  Though TG was later able to purchase SLIM BALLERINA tea in a store and found it for

2   sale online, *see* Mot. at 3, these purchases do not necessarily demonstrate bad faith or willfulness,

3   because they do not necessarily show that Twinstar continued production of SLIM BALLERINA tea

4   after stating it would no longer do so.  Rather, the availability of tea for sale may be consistent with

5   Twinstar's earlier acknowledgment that a small quantity of its SLIM BALLERINA products

6   remained in the marketplace.  *See* Hansen Decl., Ex. 10.  TG has produced no evidence

7   demonstrating the rate at which Twinstar sold its SLIM BALLERINA tea.  Further proof of

8   Twinstar's responsiveness is found in evidence provided by TG that suggests that Twinstar was

9   willing to enter into a agreement with TG to settle outstanding trademark disputes as recently as

10  January 19, 2006.  *See* Hansen Decl., Ex. 13; *cf. Earthquake Sound*, 352 F.3d at 1217.

11          As additional evidence of Twinstar's lack of bad faith, evidence produced by TG indicates

12  that in response to TG's communications, Twinstar changed its product packaging, and now sells its

13  product as  "TWINSTAR SLIM TEA."  *See* Hansen Decl., Ex. 11.  TG does not dispute the fact that

14  Twinstar revised its packaging, nor does TG claim anywhere in its pleadings that this new packaging

15  would continue to infringe upon its 3 BALLERINA word mark.  However, the TWINSTAR SLIM

16  TEA product still features the same ballerina design that appeared on the SLIM BALLERINA tea

17  packaging.  In light of the Court's findings of infringement, *see* Part II.B.2.b., *supra*, any continued

18  use by Twinstar of its ballerina design mark constitutes infringement of TG's ballerina design mark.

19          That being said, the Court does not find that Twinstar's continued use the infringing ballerina

20  design mark on its "TWINSTAR SLIM TEA," *see* Hansen Decl., Exs. 11, 24, demonstrates willful

21  infringement that would make this case "exceptional."  *See Earthquake Sound,* 352 F.3d at 1218

22  ("The issue [in determining if a case is exceptional] is not necessarily one of bad faith: willful or

23  deliberate infringement will suffice.").  The Court notes that Twinstar produced this altered

24  TWINSTAR SLIM TEA packaging in or before December 2005.  *See* Hansen Decl., Ex. 11.  In

25  TG's original cease-and-desist letter to Twinstar, dated December 14, 2004, TG only alleged that

26  Twinstar's SLIM BALLERINA tea violated TG's 3 BALLERINA word mark; TG made no mention

27  of the ballerina design mark.  *See* Hansen Decl., Ex. 6.  In TG's letters to U.S. Customs and Border

28  Protection, dated December 17, 2004 and May 12, 2005, TG only alleges that Twinstar has violated

its 3 BALLERINA word mark.  *See* Hansen Decl., Exs. 8, 9.  Thus, it is likely that the altered

TWINSTAR SLIM TEA package, *see* Hansen Decl., Ex. 11, was produced at a time when Twinstar

did not know the ballerina design mark was at issue, which suggests that retention of the design

mark on the new packaging was not willful infringement.  In the evidence submitted by TG, the first

indication that the design mark was at issue appears in a December 21, 2005 letter, in which TG

informs Twinstar in passing that its design mark is being infringed.  *See* Hansen Decl., Ex. 12

(stating that the continued availability of SLIM BALLERINA online is "further evidence of

[Twinstar's] willful and deliberate infringement of [TG's] "3 Ballerina word mark, as well as [TG's]

design mark").  This letter makes no reference to the altered packaging.  *See id.*  As late as May 15,

2006, correspondence from Twinstar's counsel to TG's suggested that Twinstar believed, however

incorrectly, that  its altered TWINSTAR SLIM TEA packaging to be in compliance with TG's

trademarks.  *See* Hansen Decl., Ex. 24 (letter from Twinstar counsel to TG counsel with copy of new

packaging, stating "Without prejudice or any admission of wrongdoing, we have been authorized by

our client to advise you that the protested trademark has been replaced by the mark TWINSTAR

SLIM, as illustrated on the copy of the packaging being enclosed herewith").  The Court notes that

Twinstar has received copies of both TG's complaint and motion for default judgment, which allege

infringement of both the word mark and design mark.  *See* Docket Nos.1, 5, 6.  Nevertheless, there is

no evidence submitted by TG that Twinstar has continued to use the infringing ballerina design mark

subsequent to service of the complaint.

Furthermore, as noted above, cases have also been deemed unexceptional when a plaintiff

has not demonstrated actual damages, and, here, TG has not provided adequate evidence of such.

*See Ferrero U.S.A.,* 952 F.2d at 47; *see also Pyramid Tech. Corp.,* 1993 U.S. Dist. LEXIS 10946, at

*9.  TG has not provided any evidence that it has lost sales because of the new product packaging

used by Twinstar, which uses the ballerina design mark but not the SLIM BALLERINA word mark.

///

///

///

///

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1   For these reasons, this case is not an "exceptional" one in which attorney fees are merited.[6]

2   *See* 15 U.S.C. § 1117(a).  Given the totality of the circumstances, Twinstar's behavior was not

3   malicious, fraudulent, deliberate or willful.  *See Lindy Pen,* 982 F.2d at 1409.  Twinstar was at least

4   partially responsive to TG's demands with respect to infringement of the word mark.  As to the

5   design mark, TG did not raise the issue of infringement with respect to the design mark until many

6   months after the parties' negotiations began, and subsequent correspondence indicates that Twinstar

7   believed, though erroneously, that their new packaging was in compliance with TG's trademark

8   rights.  Furthermore, TG did not provide any evidence of actual damages.  These considerations all

9   counsel against the awarding of fees, especially in the amount sought by TG (more than $30,000).

10  *See* Mot. at 8.

11      3.      Costs

12      Holders of federally registered trademarks are entitled to recover the costs of actions brought

13  under the Lanham Act, subject to the principles of equity.  15 U.S.C. § 1117(a); *see also Castworld*

14  *Products*, 219 F.R.D. at 502-503; *see also Planetary Motion, Inc. v. Techsplosion*, *Inc*., 261 F.3d

15  1188 (holding that under the Lanham Act, plaintiff need not establish that infringer acted

16  maliciously, fraudulently, deliberately, or willfully to recover costs).  Because the Court has found

17  Twinstar liable for infringing TG's trademark, TG is entitled to recover costs in the action that are

18  specific to Twinstar.  *See Castworld Products*, 219 F.R.D. at 503.  Accordingly, the Court

19  recommends that TG's request for award of costs in the amount of $1,861 which have accrued

20  between May and October 2006 be GRANTED.  *See* Mot. at 8.  These litigation costs include costs

21  for obtaining certified copies of TG's trademark registrations, copying costs, and messenger service

22  and postage costs.  *See* Hansen Decl., Ex. 25 (TG attorneys' invoices detailing services rendered and

23  costs incurred, from May 2006 to October 2006).

24  _____

25      [6] The Court notes that, even if a case is exceptional, a court still has discretion in deciding
    whether to award fees.  *See* 15 U.S.C. § 1117 (2007) ("The court in exceptional cases may award
26  reasonable attorney fees to the prevailing party"); *see also Dieter v. B & H Indus*., 880 F.2d 322, 328
    (11th Cir. 1989)  ("Even if the trial court finds that the circumstances of the case are, in fact,
27  exceptional, the decision whether to award attorney's fees is still discretionary."); *accord Birthright v.*
    *Birthright, Inc.,* 827 F. Supp. 1114 (D.N.J. 1993) (denying attorney's fees despite finding the case
28  exceptional because the trademark violation occurred in a nonprofit, noncommercial context).

United States District Court

For the Northern District of California

4.      Injunctive Relief

TG has requested a permanent injunction enjoining Twinstar from the following:

(1)     using the name SLIM BALLERINA and/or graphical representations of ballerinas, either separately or together, in conjunction with the offering of tea;

(2)     any other infringement of U.S. Trademark Registration Nos. 2,570,889 and 2,561,662 (TG's 3 BALLERINA word mark and ballerina design mark);

(3)     unfairly competing with TG; and

(4)     engaging in unfair and deceptive trade practices and from injuring Plaintiff's business reputation, pursuant to Section 34 of the Lanham Act (15 U.S.C. § 1116), California Business & Professions Code § 17200 *et. seq.* and the equitable power of this Court to enforce the common law of the state of California.

*See* Compl. at 7.

Under the Lanham Act, the Court has the power to grant injunctions according to the rules of equity, and on such terms as the Court deems reasonable, to prevent the violation of a mark holder's rights. *See* 15 U.S.C. § 1116(a). A plaintiff is not entitled to an injunction as a matter of course, but where, as here, a mark holder demonstrates ongoing infringement of its marks, an injunction is appropriate. *See Pepsico,* 238 F. Supp. 2d at 1177-78. ("A plaintiff is not automatically entitled to an injunction simply because it proves its affirmative claims") (internal citations omitted). Because, as discussed above, Twinstar's altered TWINSTAR SLIM TEA packaging still infringes upon TG's ballerina design mark, *see* Hansen Decl., Ex. 11, the Court finds that a permanent injunction is appropriate. Additionally, a permanent injunction is appropriate in light of Twinstar's failure to respond to TG's complaint and motion for default judgment. *See Castworld Products,* 219 F.R.D. at 502 (finding permanent injunctive relief appropriate where defendant willfully violated plaintiff's mark by selling counterfeit cigarettes bearing plaintiff's logo, and defendant had ignored plaintiff's lawsuit, leading the court to grant default judgment in favor of plaintiffs).

The Court therefore recommends that TG's request for a permanent injunction be granted. However, items 3 and 4 of the injunctive relief requested by TG are vague and overbroad. *See Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) ("An overbroad

**United States District Court**

For the Northern District of California

injunction is an abuse of discretion."); *see also* Fed. R. Civ. P. 65(d) (stating that injunctions should be set forth in specific terms).  The Court recommends that Twinstar be permanently ENJOINED from the following:

    (1)    using the name SLIM BALLERINA and/or graphical representations of ballerinas, either separately or in conjunction with the offering of tea;

    (2)    any other infringement of U.S. Trademark Registration Nos. 2,570,889 and 2,561,662 (TG's 3 BALLERINA word mark and ballerina design mark).

TG further requests that the Court order Twinstar to surrender for destruction nameplates, labels, advertisements pursuant to Lanham Act Section 36 (15 U.S.C. § 1118).  Such a request is reasonable.  *See Allergan, Inc. v. Mira Life Group, Inc.,* No. 04-36, 2004 U.S. Dist. Lexis 26811, at *6 (C.D. Cal. June 9, 2004) (ordering defendant to deliver the Court for destruction or other disposition labels, prints, packages, wrappers, receptacles, etc. that defendant used to manufacture, promote, and sell a pharmaceutical product that infringed upon plaintiff's mark).

### III.    RECOMMENDATION

Having considered the seven *Eitel* factors and the evidence of damages, the Court hereby recommends that judgment be entered in favor of TG against Twinstar.  As to the relief requested, the Court recommends that TG's request for damage be denied without prejudice.  The Court recommends that Twinstar be ordered to produce financial records indicating its profits from sales of its SLIM BALLERINA tea, and that the presiding judge retain jurisdiction to determine damages based on Twinstar's profits from its SLIM BALLERINA tea.  Additionally, TG may submit further evidence in its attempt to prove another measure of damages.  The Court further recommends that TG be awarded its costs, in the amount $1,861, but not its attorney's fees.  Finally, the Court recommends that a permanent injunction be issued that enjoins Defendant from the following:

    (1)    using the name SLIM BALLERINA and/or graphical representations of ballerinas, either separately or in conjunction with the offering of tea; and

    (2)    any other infringement of U.S. Trademark Registration Nos. 2,570,889 and 2,561,662 (TG's 3 BALLERINA word mark or ballerina design mark).

1   Defendants should also be ordered to surrender for destruction nameplates, labels, advertisements

2   for the Slim Ballerina tea or graphic representation of ballerinas used with the offering of tea.

3         Any party may file objections to this report and recommendation pursuant to 28 United

4   States Code § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and Local Rule 72-3.

5

6

7   Dated: March 22, 2007

8                                                    _____
                                                     EDWARD M. CHEN
9                                                    United States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

30